630 A.2d 874

Floyd PHILLIPS and Kathryn G. Phillips, His Wife

v.

A.P. GREEN REFRACTORIES COMPANY; Allegheny Sand, Inc.; Armstrong World Industries, Inc., in its own Right and as Successor-in-Interest to Armstrong Cork Company and Armstrong Contracting and Supply Co.; The Boc Group, Inc. in its own Right and as Successor-in-Interest to Airco Welding Products Co.; Combustion Engineering, Inc.; Dresser Industries, Inc., and its Division Harbison–Walker Refractories; Foseco, Inc.; The Gage Company, Formerly Pittsburgh Gage and Supply Co.; General Refractories Company; H.K. Porter Company, Inc., in its own Right and as Successor-in-Interest to Southern Textile Company, Formerly Southern Asbesto Company; J.H. France Refractories Company; Keene Corporation, in its own Right and as Successor-in-Interest to Baldwin Hill Co., Baldwin–Ehret–Hill, Inc., Ehret Magnesia Manufacturing Company, The Insulation Division of Mundet Cork Company, Mundet Company, and to Keene Building Products Corporation; New Jersey Pulverizing Company, Inc.; Nicolet, Inc., in its own

Right and as Successor-in-Interest to Nicolet Industries, Inc., and to the Industrial Products Division of Keaseby & Mattison Co.; Owens–Illinois, Inc., Pennsylvania Glass Sand Corporation; TYK Refractories Company, in its own Right and as Successor-in-Interest to Swank Refractories; Walter C. Best, Inc.; and Westinghouse Electric Corporation

v.

BOGNAR & COMPANY; Hickman–Williams Co.; Downer Silica Company; Manley Brothers of Indiana; Keklo Refractories of Pennsylvania; New Jersey Silica Sand Company; R.J. Glass; American Colloid Company; Applied Industrial Materials Corporation, also Known as Aimcor; International Mineral and Chemical Corporation, also Known as IMC; and the Warner Company.

Appeal of PENNSYLVANIA GLASS SAND CORPORATION, now Known as U.S. Silica Company.

Nick HARMOTTA and Margaret Harmotta, His Wife

v.

WALTER C. BEST, INC., a corporation; Pennsylvania Glass Sand Corporation, a Corporation; Allegheny Sand, Incorporated, a Corporation; and J.H. France Refractories Company, a Corporation

v.

The WARNER COMPANY, a Corporation; New Jersey Silica Sand Company, a Corporation; Owens–Illinois, Inc., a Corporation; Hickman–Williams Company, a Corporation; Downer Silica Sand Company, a Corporation; Manley Brothers, a Corporation; A.P. Green Refractories Company, a Corporation; Combustion Engineering, Inc., a Corporation; H.K. Porter, Inc., in its own Right and as Successor-in-Interest to Southern Textile Company, Formerly Southern Asbestos Company, a Corporation; Harbison–Walker Refractories, Inc., a Corporation; General Refractories Company, Inc., a Corporation

v.

AMERICAN COLLOID COMPANY, INC.; Applied Industrial Materials Corporation, a/k/a Aimcor; International Mineral and Chemical Corporation, a/k/a IMC.

Appeal of WALTER C. BEST, INC., a Corporation; Pennsylvania Glass Sand Corporation, a Corporation.

Superior Court of Pennsylvania.

Argued April 21, 1992.

Filed July 15, 1993.

Reargument Denied Sept. 22, 1993.

170

Joseph W. Montgomery, III, Pittsburgh, for appellants in Nos. 1545 and 1651.

Joseph S.D. Christof, Pittsburgh, for appellants in Nos. 1545 and 1651.

Tyre A. Brett, Pittsburgh, for appellees in Nos. 1545 and 1651.

Before TAMILIA, HUDOCK and HESTER, JJ.

TAMILIA, Judge:

Walter C. Best, Inc. (Best) appeals the judgment entered September 19, 1991 at No. 01651 Pittsburgh, 1991, in accordance with the $22,500 jury verdict for Nick and Margaret Harmotta. Pennsylvania Glass Sand Corporation (PGS) appeals the September 19, 1991 judgments entered at Nos. 01651 and 01545 Pittsburgh, 1991, following the $22,500 jury verdicts for both the Harmottas and Floyd and Kathryn G. Phillips.

These consolidated appeals stem from products liability actions brought against appellants and various other manufacturers and/or suppliers of silica-containing products for damages Nick Harmotta and Floyd Phillips allegedly sustained while they were employed for approximately 30 years at the foundry of U.S. Steel's Johnstown Works. Appellees contended they contracted silicosis as a result of working with and being exposed to silica sand supplied by appellants. In their complaints, appellees alleged appellants' conduct constituted negligence and also rendered them strictly liable for failing to warn appellees directly of the potential hazards associated with prolonged exposure to silica dust. The two cases were consolidated for trial.

On April 15, 1985, prior to the filing of their complaint, the Harmottas filed a workmen's compensation claim against U.S. Steel as a result of the same alleged injuries. After an examination of expert medical reports from both parties and testimony from Harmotta, and subsequent to the Harmottas civil action filed January 16, 1986, the referee, on July 25, 1986, found Harmotta was not entitled to benefits under the Workmen's Compensation Act. As a result, on April 29, 1988, Best filed a motion for summary judgment on the basis the Harmottas' claim had already been litigated and denied in the worker's compensation proceeding and thus was barred by collateral estoppel. On May 23, 1988, the trial court denied the motion. On April 6, 1989, Best, on the same theory, refiled the motion for summary judgment requesting reconsideration of the prior determination. The motion was denied on July 31, 1989, the court "reserving to all defendants the right to preserve [the] issues for appellate review." (Slip Op., Creany, S.J., 7/31/89, p. 3.)

A jury trial commenced on April 2, 1990, and at the close of Harmotta's and Phillips' evidence, several defendants made a motion for compulsory nonsuit. Owens–Illinois, Inc., on behalf of all defendants, argued the strict liability claim should be nonsuited because the evidence did not demonstrate that bulk silica sand supplied to foundries was an unreasonably dangerous product and, thereby, did not establish a duty on the part of the sand-supplier defendants to warn of any hazards connected to the product. Harmotta and Phillips countered with the assertion that the evidence had demonstrated that bulk sand carried a latent risk of harm, i.e. silicosis, making it unsafe for its intended use in the absence of warnings, thereby satisfying the threshold criteria for finding the product unreasonably dangerous, and allowing the court to make the social policy decision that the jury should be permitted to consider the imposition of strict liability.

Defendants also argued that they were entitled to judgment upon Harmotta's and Phillips' negligence counts, where the evidence at trial did not demonstrate that the defendant sand suppliers acted unreasonably in relying upon Harmotta's and

Phillips' employer, U.S. Steel Corporation (U.S. Steel), to communicate to its employees any dangerous condition associated with the usage of the product. In response, Harmotta and Phillips noted that they did not have the burden to prove that the defendants acted unreasonably, but rather, that the defendants, asserting a "sophisticated user" affirmative defense to negligence, had the burden of demonstrating the reasonableness of their conduct, and that reasonableness is generally a question for the jury.

The trial court held plaintiffs had presented sufficient evidence to permit the matter to proceed to the jury on both strict liability and negligence theories of recovery.

On April 26, 1990, at the close of defendants' evidence, Harmotta and Phillips moved for a compulsory nonsuit on both the defendants' breach of a strict liability to warn, as well as their breach of the negligent duty to warn, maintaining that the only remaining issue for jury determination was whether the breach of the duty to warn had proximately caused the injuries to Harmotta and Phillips. The defendants moved for directed verdicts, again alleging that the evidence was insufficient as a matter of law to demonstrate that bulk sand was an unreasonably dangerous product for purposes of strict liability, or that the defendant sand suppliers had acted unreasonably in relying upon U.S. Steel to communicate any dangers connected to silica usage to its employees. All of these motions were denied and the matter was submitted for jury consideration on both strict liability and negligence theories.

On May 3, 1990, the jury returned a $22,500 verdict for the Harmottas and against Best and PGS and a $22,500 verdict for the Phillips and against PGS only. Each verdict was based upon the finding of strict liability under section 402A of the Restatement (Second) of Torts. Timely post-trial motions for judgment n.o.v. were denied and this appeal followed.

In reviewing the denial of a judgment n.o.v., the decision of the trial court should not be reversed in the absence of an abuse of discretion or an error of law which controlled the

outcome of the case. *Williams v. A–Treat Bottling Co.*, 380 Pa.Super. 195, 551 A.2d 297 (1988).

 Initially, having carefully reviewed the record regarding Best's contention the trial court erred in denying its motions for summary judgment in the Harmotta case based upon collateral estoppel principles,[1] we agree and reverse the judgment entered against Best.

> As an appellate court, we are bound to consider certain principles which dictate when and under what circumstances a trial court may properly enter summary judgment. The trial court must accept as true all well-pleaded facts in the non-moving party's pleadings, and give to him or her the benefit of all reasonable inferences to be drawn therefrom. Summary judgment should not be entered unless the case is clear and free from doubt. A grant of summary judgment is proper where the pleadings, depositions, answers to interrogatories and admissions on file support the lower court's conclusion that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Pa.R.C.P. No. 1035, 42 Pa.C.S.A.

*Lower Lake Dock Co. v. Messinger Bearing Corp.*, 395 Pa.Super. 456, 460–61, 577 A.2d 631, 634 (1990) (citations omitted).

> Collateral estoppel is appropriate where: (1) the issue decided in the prior action was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the plea is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Grant v. GAF Corp.*, 415 Pa.Super. 137, 149, 608 A.2d 1047, 1053 (1992).

---

1. The Harmottas' contention this issue has not been preserved for review is without merit. Appellants have argued consistently throughout the proceedings the trial court erred in its pretrial ruling summary judgment was not proper.

In denying summary judgment to Best on the collateral estoppel issue, the trial court stated "a workmens compensation claim is clearly distinguishable from a common law tort claim, including one based on strict products liability." Order, Creany, S.J., 7/31/89, p. 1. The court found the issues involved in the cases differed in that, generally, in worker's compensation actions, disability resulting from work place conditions is the only issue for decision, while in products liability actions, the injury caused by a defective product is the issue under review. We find this distinction is not meaningful or controlling, as it was previously rejected by *McCullough v. Xerox Corp.*, 399 Pa.Super. 135, 581 A.2d 961 (1990), *alloc. den.*, 527 Pa. 624, 592 A.2d 45 (1991), wherein this Court stated:

> Appellant argues, however, the issue presented to and decided by the referee was a narrowly defined statutory one, i.e., had appellant suffered an occupational disease injury. In light of our previous discussion, though, this argument is without basis. As we stated, the referee found unequivocally appellant's injury was not work-related, and appellant had failed to sustain her burden of proof. This failure was grounded not in appellant's inability to establish her sarcoidosis as an occupational disease injury, for her claim proceeded without that determination, but rather, in appellant's inability to prove the causation of her injury was aggravated, accelerated or related in any way to her work for Xerox. This was the central issue in appellant's workmen's compensation claim, just as it is instantly, and appellant was afforded a full and fair opportunity to litigate the issue before the referee. As that judgment is now final, appellants are estopped from pursuing the identical issue in a common law tort action. To find otherwise would be to undermine the concept of workmen's compensation which has served the workers and economic structure of our society so well.

*Id.* at 143–44, 581 A.2d at 966.

More recently, this Court addressed the collateral estoppel issue in *Grant, supra,* where the plaintiffs brought workmen's

compensation actions against the defendant for injuries allegedly sustained in the workplace. While these claims were pending, plaintiffs brought common law tort actions for the same injuries. Their complaints focused more on the defective product rather than their disabilities resulting from poor conditions in the workplace. This Court affirmed the trial court's grant of summary judgment based on collateral estoppel.

> The doctrine of collateral estoppel is not unavailable simply because administrative procedures are involved; where the agency is acting in a judicial capacity and resolves disputed issues of fact which the parties had an opportunity to litigate, the court's will not hesitate to apply preclusion principles.
>
> . . . . .
>
> [T]he principles of collateral estoppel apply to judgments from worker's compensation boards.
>
> . . . . .
>
> The issue of causation, injury as a result of exposure in the workplace, was decided adversely to the plaintiffs in the workmen's compensation proceeding and thus recovery in a subsequent tort action is precluded.

*Id.* at 151, 153–155, 608 A.2d at 1055, 1056.

*Grant* applies directly to the facts in this case. Harmotta filed a workmen's compensation action against U.S. Steel which was denied by the referee, who adopted the expert opinion of the U.S. Steel's doctor as opposed to Harmotta's doctor in finding Harmotta was not suffering from any occupationally acquired lung disease, as there was no definite evidence of silicosis. In essence, Harmotta, through the civil action, asked the court to relitigate the exact issue which already had been decided adversely to him; that is, whether his employment was the cause of his injuries. In his complaint, Harmotta alleged: "As a direct and proximate result of the inhalation of the silica dust and silica sand contained in the products of defendants, plaintiff contracted silicosis with associated complications, which resulted in his total disability."

Harmotta Complaint, 1/17/86, paragraph 14. Thus, the first of the four conditions necessary for an appropriate application of collateral estoppel has been met—the issues raised in the proceedings are identical.

Second, there must have been a final judgment on the merits in the initial proceeding. Harmotta argues the decision by the referee was not final because worker's compensation decisions inherently lack finality in that the nature of occupational diseases is that one's condition can worsen and can become disabling over time, thus giving one the opportunity to reassert one's claim at a later date. Harmotta contends his injury has progressed and, therefore, the decision by the referee is stale and should not have collateral estoppel effect. According to the Workmen's Compensation Act, 77 P.S. § 833, Witnesses; books and other writings; findings of fact, unless a decision of a referee is timely appealed, the referee's findings of fact become final as a matter of law. Harmotta did not appeal the referee's decision nor did he refile for worker's compensation benefits. Instead, Harmotta chose to file a civil tort action on January 16, 1986, before the referee even handed down his decision. Moreover, the medical report of Dr. Pickerell, specifically adopted by the referee, was dated March 6, 1986. The report indicates Dr. Pickerell examined Harmotta on March 3, 1986, about six weeks *after* the Harmottas filed their civil suit. Harmotta's "progression of the injury" argument is, therefore, disingenuous and rendered to be totally without merit.

The third element of collateral estoppel is not in dispute. Harmotta, against whom the doctrine is being raised, is the plaintiff here, as he was in the worker's compensation proceeding.

Finally, we must determine whether Harmotta had a full and fair opportunity to litigate the issue in question during the worker's compensation proceedings. The referee was presented with expert medical reports from both sides and testimony from Harmotta. Neither party objected to the reports and both parties waived cross-examination on these issues. Although Harmotta now claims the compensation proceedings

were limited in that medical reports were submitted and cross-examination did not take place, this does not negate the fact the *opportunity* for further hearings, testimony and cross-examination was available.[2] We disagree with Harmotta's argument and the trial court's determination that Harmotta litigated only the "disability" not the "injury." This is a distinction without a difference. Harmotta was represented by counsel at all times during the worker's compensation hearing and we find he was given a full and fair opportunity to present his case before the referee.

Harmotta also argues even assuming the elements of collateral estoppel are present, application of this doctrine in this case would violate his constitutional right to a trial by jury under Article I, section 6, of the Pennsylvania Constitution and also would violate the doctrine of separation of powers. We reject Harmotta's arguments based upon the recent and detailed analysis of these issues set forth by this Court in *Grant, supra.*

Even in the absence of the application of collateral estoppel to this case, appellees could not have prevailed as no action would have been available because of the manner in which we have ruled subsequently as to strict liability of its provider under the "sophisticated user" doctrine.

Accordingly, based upon the court's error in failing to grant summary judgment for Best on the grounds of collateral estoppel, we vacate the judgment entered against Best and enter judgment n.o.v. for Walter C. Best, Inc., at No. 01651 Pittsburgh, 1991.

As to appellant PGS, PGS argues the trial court erred in denying its motion for judgment n.o.v. because its product was neither defective nor unreasonably dangerous and, therefore, the strict liability question never should have reached the jury. The trial court found "the question of whether the danger

2. While appellee Harmotta states there was no testimony taken from the medical experts at the compensation hearing (appellee's brief at 29), appellant Best points out that in addition to Mr. Harmotta's testimony, Dr. Klemens, who also submitted a written report, testified on behalf of Harmotta.

existing in the defendant's sand was a proper question for a jury and not one for the Court to make as a matter of law." (Slip Op., Creany, S.J., 8/23/91, p. 2.) After considering the circumstances, the law and social policy concerns, we agree with PGS the trial court erred in submitting the issue of strict liability for PGS' failure to warn appellees of the dangers inherent in its product.

▮ Initially, in order for strict liability to apply, it is necessary to determine whether silica is "unreasonably dangerous." *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984), appeal dismissed, 508 Pa. 643, 500 A.2d 428 (1985). Before turning over the case to the jury, the court must decide whether strict liability should be imposed. *Mackowick v. Westinghouse Electric Co.*, 525 Pa. 52, 575 A.2d 100 (1990).

> While the manufacturer's responsibility for injuries resulting from the lack of warning as a defect in the product is an expansion of the supplier's role as a guarantor of a product's safety, it was not intended to make the manufacturer an insurer of all injuries caused by the product. *See Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978).

*Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 225, 545 A.2d 906, 909 (1988) (footnote omitted). In deciding whether a product is unreasonably dangerous, a trial court must examine social policy questions and determine whether the risk of loss should be placed upon the supplier. "When a products liability claim is pleaded the trial judge makes a threshold determination whether as a matter of social policy the case is appropriate for treatment under the rubric of products liability. In making this determination the judge acts as a combination social philosopher and risk-utility economic analyst." *Id.* at 228, 228 n. 6, 545 A.2d at 910 n. 6 (citation omitted). The court must balance "the utility of the product against the seriousness and likelihood of the injury and the availability of precautions that, though not foolproof, might prevent the injury." *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 450, 467 A.2d 615, 618 (1983), citing *Schell*

*v. AMF, Inc.*, 567 F.2d 1259 (3d Cir.1977). In *Dambacher, supra*, and most recently in *Fitzpatrick v. Madonna and Outboard Marine Corporation*, 424 Pa.Super. 473, 623 A.2d 322 (1993), this Court identified additional factors for a court to consider in such situations.

The California Supreme Court has identified the following factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; the financial cost of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design. *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 237, 573 P.2d 443, 455 (1978). Dean Wade [Wade, *On the Nature of Strict Tort Liability For Products*, 44 Miss.L.J. 825 (1973)] has formulated a similar list:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe;

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

Wade, *supra* at 837–38 (footnote omitted).

*Id.,* 424 Pa.Super. at 476–77, 623 A.2d at 324 quoting *Dambacher, supra* at 50 n. 5, 485 A.2d at 423 n. 5.

██ While recognizing there is a latent danger in the long-term use of silica sand, there is no substitute for silica sand in the industrial process and no safer alternative is available. More importantly, appellees, the users of the product, knew or should have known of the hazard, which was reasonably avoidable through the use of personal respirators supplied to appellees by U.S. Steel. Another policy factor to consider is that the cost of PGS directly and effectively warning foundrymen about the silica hazard would be unrealistically high and impractical. Since the foundrymen did not receive the shipments of the sand, they would never receive PGS's written warnings. In the alternative, it would be prohibitively expensive and unduly burdensome to require suppliers to orally warn each worker and continuously monitor them to make sure they were wearing their respirators. Therefore, PGS cannot feasibly reduce the risk to end-users such as appellees and the strict liability question never should have reached the jury.

██ We also find under the facts of this case, application of the sophisticated user doctrine provides a supplier such as PGS a defense to strict liability. Section 388 of the Restatement (Second) of Torts, otherwise known as the sophisticated user doctrine, provides as follows:

**§ 388. Chattel known to be Dangerous for Intended Use**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment n to section 388, **Warnings given to third person,** states that a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects.

As there is no Pennsylvania case specifically addressing the issue, we now specifically hold section 388 may be used as a defense to strict liability as well as negligence actions.

In *Smith v. Walter C. Best, Inc.,* 927 F.2d 736 (3rd Cir. 1990), a case factually similar to the case at bar, the Court of Appeals for the Third Circuit followed Ohio law in applying section 388 to find the defendants, suppliers of silica sand, were not strictly liable to the end-user/employee of the firm which had purchased the sand from defendants. We find the Third Circuit's adoption of the following logic from *Higgins v. E.I. Dupont de Nemours, Inc.,* 671 F.Supp. 1055 (D.Md.1987), to be persuasive:

[In] addition to the fact that the authorities reviewed above have concluded that the standards for negligent and strict liability failure to warn are essentially the same, this court independently finds nothing about failure to warn in the context of strict liability that is inconsistent with the principles encompassed in comment n to § 388. Quite simply, both negligent and strict liability failure to warn involve the same questions of scope of duty and causation: (1) To what extent did the supplier act reasonably in communicating or failing to communicate a warning? (2) Given information supplied by the supplier, was the failure of a sophisticated user to communicate an effective warning to an employee or other ultimate user an intervening cause of injury? Prosser points out, it is really only the immunity of strict liability to negligence-based defenses (like contributory negligence) that distinguishes strict liability from negligence in failure

to warn cases. This distinction does not militate against making the sophisticated user/bulk supplier defense available in a § 402A strict liability failure to warn claim.

*Smith, supra,* 927 F.2d at 742 (footnote omitted), quoting *Higgins, supra,* 671 F.Supp. at 1060.

Appellees contend holding the employer responsible under the sophisticated user doctrine would unjustifiably absolve the supplier of any duty to warn ultimate users and would contravene the nondelegability principle of *Berkebile v. Brantley Helicopter Corp.,* 462 Pa. 83, 102–104, 337 A.2d 893, 903 (1975). In addressing this very same argument, the court in *Kennedy v. Mobay Corp.,* 84 Md.App. 397, 579 A.2d 1191 (1990), affirmed per curiam No. 152, Special Term, 1990, 325 Md. 385, 601 A.2d 123, (1992), stated as follows:

There *is* a duty to warn of defects or propensities that make a product hazardous, and that duty *does* extend ordinarily to those who may reasonably be expected to use or come into harmful contact with the product. It is *not* a duty, we think, from which the supplier can be entirely *absolved.* The question, rather, is, what conduct will suffice to discharge that duty?

Viewed in that context, the defense is not only logical but necessary. Where it is impracticable for the supplier to give adequate warnings directly to all who may use or come into contact with the product, some substitute for such direct warnings is required, even in strict liability cases. Otherwise, as Messrs. Schwartz and Driver observed, *supra,* strict liability would become, in effect, absolute liability. As comment n to Restatement § 388 makes clear, the focus remains on the conduct of the supplier, but that conduct is judged in light of the circumstances. Among those circumstances are the feasibility of giving direct warnings to all who are entitled to them and, where that is not feasible, whether the supplier acted in a manner reasonably calculated to assure either that the necessary information would be passed on to the ultimate handlers of the product or that their safety would otherwise be attended to. In such a situation, that is all that reasonably can be asked and it is

all, we think, that the law requires. The Fourth Circuit Court of Appeals, applying Virginia law in *Willis v. Raymark Industries, Inc.*, 905 F.2d 793 (4th Cir.1990), made the point exactly, stating at 797: "Comment n clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the employer prior to and during the time the workers were exposed." (Emphasis omitted.)

*Id.* at 413, 579 A.2d at 1199. Under section 388, the supplier remains under a duty to warn end-users, but can rely on a knowledgeable employer to convey the warnings. In this situation, the supplier is not delegating its duty, and it still can be found liable for end-users' injuries if its reliance upon the employer was unreasonable under the circumstances. Here, the facts show PGS's reliance upon U.S. Steel was reasonable since, as early as the 1940's and 1950's, due to its large role in the Industrial Health Foundation, which was formed to study silicosis and other occupational diseases, U.S. Steel had full knowledge of the potential hazards of extended exposure to silica. Moreover, U.S. Steel was in the best position to warn the workers by promoting safety through the use of air monitoring devices and respirators and to monitor the use of this equipment.

The extension of workplace warnings liability unguided by practical consideration has the unreasonable potential to impose absolute liability in those situations where it is impossible for the manufacturer to warn the product user directly. In the workplace setting, the product manufacturer often cannot communicate the necessary safety information to product users in a manner that will result in reduction of risk. Only the employer is in a position to ensure workplace safety by training, supervision and use of proper safety equipment. Designating the manufacturer an absolute insurer of its product removes the economic incentives that encourage employers to protect the safety of their employees.

Schwartz and Driver, *Warnings In The Workplace: The Need For A Synthesis Of Law And Communication Theory*, 52 U.Cin.L.Rev. 38, 43 (1983).

Further, since the jury found appellants were not negligent for failing to warn appellees, it follows PGS could not be found strictly liable after applying the section 388 defense.

The facts surrounding PGS's delivery of the sand in bulk and unpackaged form and reliance upon U.S. Steel for warnings are almost identical to the facts in *Smith, supra,* wherein the court stated as follows:

> Based upon the record in this case we believe that it was reasonable for the sand suppliers to assume that Valley Mould knew of the dangers of silica given the state of common medical knowledge at all relevant times, the various statutes and regulations governing silica, and the fact that Valley Mould was a member of the Industrial Health Foundation, a non-profit organization providing information to its members relative to occupational diseases (including silicosis) and their prevention. This reasonable assumption of knowledge, coupled with the duty owed by Valley Mould to provide its workers with a safe working environment and the virtual impossibility of the sand suppliers reaching the ultimate users, is, in our view, sufficient to satisfy the Restatement standard and to justify the sand suppliers' reliance on Valley Mould, as a knowledgeable purchaser, to warn the ultimate sand users.

*Smith, supra,* 927 F.2d at 742.

In conclusion, upon consideration of social policy implications, the trial court erred in determining PGS's product was defective or unreasonably dangerous under 402(A) and thereby erred in sending the strict liability issue to the jury. Accordingly, we reverse the judgments entered against PGS in both the Harmottas' and Phillips' cases since application of the sophisticated user/bulk supplier doctrine necessitates a finding PGS was not strictly liable for failing to warn appellees of the dangerous propensities of its product.

The judgments entered at Nos. 01545 and 01651 Pittsburgh, 1991 are vacated.

Judgment n.o.v. entered for Pennsylvania Glass Sand Corporation, now known as U.S. Silica Company, at Nos. 01545 and 01651 Pittsburgh, 1991.

Judgment n.o.v. entered for Walter C. Best, Inc., at No. 01651 Pittsburgh, 1991.

Jurisdiction relinquished.

Concurring and dissenting statement by HUDOCK, J.

HUDOCK, Judge, concurring and dissenting in a statement.

I join only that portion of the majority opinion which affirms the grant of summary judgment against the Harmottas based on the principle of collateral estoppel. Notwithstanding the ambiguous statement by the trial court in its 1925(a) statement, my review of the record convinces me that the court implicitly made the threshold determination that, absent warnings, the silica sand and/or flour in this case was unreasonably dangerous and thus subject to the rubrics of strict liability. Such a threshold determination need not be express. *See Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1986) (*en banc*) (in the absence of a motion requesting the court to make explicit its ruling on the threshold determination of social policy, it will be presumed that, in permitting the case to go to the jury, the determination was made against the defendant).

Additionally, I cannot concur in the social policy determination conducted by my colleagues by which they reach the conclusion that, despite the latent danger, the strict liability question should not have reached the jury. I would find that the strict liability cause of action was properly submitted to the jury. As Appellants conceded that no warnings were given by them, the next matter placed at issue is whether the sophisticated user doctrine should be recognized as a defense to strict liability. Since the majority found the strict liability issue should not have been submitted to the jury, its "holding" that the doctrine is an affirmative defense is *dicta*.

Finally, I disagree with the statement in *dicta* that the sophisticated user doctrine should be allowed as a defense to

strict liability under the facts of this case. Comment (n) to Section 388 states, "a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate consumers ..." My review of the record reveals no evidence that Appellants provided such information to the steel industry. Appellants cannot wholly rely on the "sophisticated user" in discharging their duty.

I would reverse the verdict against Walter C. Best, Inc., in the Harmotta appeal, but otherwise affirm the jury awards to the Harmottas and the Phillipses.